UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:09cv414-RJC-DSC

| | |
|---|---|
| BARBARA HILL, | )<br>)<br>) |
| Plaintiff, | )     ORDER<br>) |
| v. | )<br>) |
| HARTFORD LIFE & ACCIDENT<br>INSURANCE COMPANY, | )<br>)<br>) |
| Defendant. | )<br>) |

**THIS MATTER** is before the Court on the parties' cross-motions for summary judgment (Doc. Nos. 14 & 16) and related pleadings. For the reasons stated below, the Court will **GRANT** the defendant's motion and **DENY** the plaintiff's motion.

## I. BACKGROUND

The plaintiff Barbara Hill brings this action to recover benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. Hill is a registered nurse with a four-year college degree who began working in 1991 for Novant Health ("Novant") as a clinical analyst. As a clinical analyst, Hill was responsible for performing periodic records audits of records at physicians' offices and maintaining summaries of these audits in various databases. Hill was eligible for long-term disability ("LTD") benefits under an employee benefits plan (the "Plan") offered by Novant. The Plan defines "disability" in the following manner:

> **Disability** or **Disabled** means that during the Elimination Period and for the next 24 months you are prevented by:
>
> 1. accidental bodily injury;
> 2. sickness;

3. Mental Illness;
4. Substance Abuse; or
5. pregnancy,

from preforming one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.

After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

* * *

**Your Occupation** . . . means your occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location.

* * *

**Any Occupation** means an occupation for which you are qualified by education, training or experience.

(A.R. 66 & 72).[1] The defendant Hartford Life & Accident Insurance Company ("Hartford") funded the Plan through a policy issued to Novant. Hartford retained sole discretion to interpret the Plan and determine claimants' eligibility for benefits. (A.R. 65).

**A. Award of Benefits under the Own Occupation Standard**

Hill appears to have been a valued employee at Novant throughout the majority of her career, although she suffered from chronic back injuries that required a number of surgeries. Hill underwent laminectomy[2] and diskectomy[3] procedures to reduce pressure on her spinal cord in 1991, 1994, 1996, and 1998. (A.R. 540-82). She underwent similar procedures again in 2004 and 2005, also

---

[1] Both parties have stipulated that the Administrative Record ("A.R.") jointly submitted in this case is a true and accurate copy of the Plan issued to Hill and all documents and information relied upon by Hartford in its consideration of her claim for LTD benefits.

[2] A laminectomy is an excision of the posterior arch of the vertebra. Dorland's Illustrated Medical Dictionary 894 (27th ed. 1988) (hereinafter "Dorland's").

[3] A diskectomy is an excision of an intervertebral disk. Dorland's at 495.

2

receiving a facectomy[4] and cervical corpectomy, which is a surgical procedure that involves removing part of the vertebrae in order to decompress the spinal cord and nerves. (A.R. 701-04 & 710-11). After each surgery, Hill's condition seemed to improve, and she would return to work full-time at Novant. Beginning in late 2005, however, Hill's back pain increased in severity and she began taking hydrocodone and cyclobenzaprine, a muscle relaxant. In March 2006, Hill received a documented reprimand from Novant concerning errors in her data entry and spreadsheet maintenance. (A.R. 529-31). These problems continued, and she received her first threat of termination on April 12, 2006. (A.R. 538). Hill's supervisors noted that she "trie[d] very hard," and seemed "overwhelmed by the recent increased workload . . . ." (A.R. 537). Seeing no improvement, Novant decided to terminate Hill's employment on July 11, 2006, but allowed to her resign instead. (A.R. 539). Hill underwent another laminectomy and facectomy procedure several days later on July 19, 2006. (A.R. 668-70).

In April 2007, Hill submitted a claim to Hartford for LTD benefits, which was initially denied based on a finding that Hill's employment was terminated prior the onset of her disability. (A.R. 613). However, Hartford reversed its decision on appeal, due in large part to the opinion offered by Dr. Vernon Mark, an independent physician hired by Hartford to review Hill's claim. Dr. Mark reviewed the materials in Hill's claim file and determined:

> She could not have continued to work in an effective fashion up to her surgery date because she was consuming pain medication that caused her to be ineffective and inaccurate in her job performance. This is a woman who worked in this field for 18 years for the same employer. It wasn't until her back and leg pain persisted, in spite of epidural steroid injections, that she began to consume substantial amounts of pain medication that, more likely than not, was responsible for her poor job performance. . . . With enough pain medication, she probably could have appeared at the hospital but her resulting brain function impairment would not have permitted her to perform

---

[4] A facectomy is an excision of the articular facet of a vertebra. Dorland's at 603.

>her job duties. This is verified by the fact that her hospital superiors were going to fire her on 07/11/06 because of her cognitive impairment secondary to her pain medications.

(A.R. 488). On the basis of this opinion, Hartford determined on October 31, 2007, that Hill was disabled from performing her own occupation and awarded her LTD benefits retroactive to an effective date of October 9, 2006. As one condition to receiving disability benefits, the Plan required Hill to apply for disability benefits from the Social Security Administration as well. (A.R. 63). Hill applied for and received Social Security Disability ("SSD") benefits on January 11, 2008. (A.R. 417). As the Plan also required, Hill's monthly LTD benefits were reduced by the amount she received from the Social Security Administration. (A.R. 108).

During the two-year period that she received disability benefits from Hartford, Hill continued to suffer from back pain and, additionally, she began to experience increasing hand, wrist, and shoulder problems. Hill first underwent arthroscopic surgery to repair a left rotator cuff tear in 2001. She recovered well from this procedure and apparently experienced no problems in her upper extremities until 2006 when she underwent the same procedure in her right shoulder in 2006. In March 2007, she began to complain of pain and discomfort in her left shoulder. She was referred to Dr. John Gaul, who in November 2007 performed a carpal tunnel release on her right wrist and bilateral surgery for trigger thumb, a painful disorder characterized by the catching, snapping, or locking of the thumb tendons. (A.R. 314). Hill began taking methadone, an opiate, to control her pain. Her pain continued unabated, and on September 23, 2008, Dr. Gaul performed a carpel tunnel release on Hill's left wrist as well. (A.R. 189-90).

Hill also began seeing Dr. Richard Boortz-Marx, a pain management specialist. In assisting Hill with pain management, Dr. Boortz-Marx took an overview of her pain medication and

4

questioned Hill about their side effects. In August 2008, Dr. Boortz-Marx noted that Hill was tolerating her medication well and continued to prescribe her refills for methadone. (A.R. 216-17).

**B. Denial of Benefits under the Any Occupation Standard**

At the expiration of twenty-four months, Hill's Plan required her to show that she was unable to perform the essential functions of any occupation to continue receiving LTD benefits. In preparation for its determination of Hill's claim under this new standard of disability, Hartford sought information from Hill's treating physicians. Dr. Boortz-Marx submitted an Attending Physician's Statement ("APS") to Hartford on July 11, 2008, outlining Hill's functional capabilities. (A.R. 296). He indicated that Hill could sit and stand for one to two hours at a time, and walk for one hour at a time. Additionally, Hill could sit for a total of six to eight hours a day, stand for a total of three hours, and could "occasionally" lift and carry one to ten pounds. Initially, Dr. Boortz-Marx indicated that Hill could "never" perform fingering and handling maneuvers, presumably due to her carpal tunnel and trigger thumb diagnoses. However, Rochelle Gibbs, a claims analyst working for Hartford, believed this to be a mistake and asked Dr. Boortz-Marx to re-submit his APS. (A.R. 287). Dr. Boortz-Marx submitted a corrected APS form in which he indicated that Hill could perform fingering and handling without restriction. (A.R. 260).

In August 2008, Hartford commissioned Dr. Wayne Blake, Ph.D., to perform an analysis of Hill's vocational capabilities and present his findings in an Employability Analysis Report ("EAR"). (A.R. 246-48). In performing the analysis, Dr. Blake relied on the APS submitted by Dr. Boortz-Marx to conclude that her only functional limitation was that she could perform only sedentary work. After cross-referencing Hill's physical capabilities, education, and experience with a database of 12,741 occupations classified by the U.S. Department of Labor Dictionary of Occupational Titles ("DOT"), fourteen potential occupations were identified. The closest occupational matches were

5

"Utilization—Review Coordinator," "Employee Relations Specialist," and "Claim Examiner." Hill's EAR noted that each of these occupations typically offer salaries exceeding 60% of her pre-disability income, or $2,930 per month.

Hartford reviewed these materials, a questionnaire completed by Hill, and the office notes of Dr. Gaul and Dr. Edwin Shoaf, Hill's primary care physician. Hartford then denied her claim, stating, "Based on this information, we have concluded that you are not prevented from performing the essential duties of Any Occupation. Because of this, you will not meet the policy definition of Disability as of October 9, 2008 and your LTD benefits will terminate on that date." (A.R. 237).

Hill appealed, obtaining a neuropsychological evaluation from Dr. Jeffrey Ewert, Ph.D. During her initial consultation with Dr. Ewert in February 2009, Hill reported taking daily doses of tramadol and methadone to control her pain. While noting that Hill's IQ was in the "high average" range, and her verbal learning ability for categorically related information was "very superior overall," Dr. Ewert characterized her score on the Booklet Category Test[5] as "in the moderately impaired range of functioning." (A.R. 161). Dr. Ewert also noted that Hill's "[r]eading at the paragraph level was severely impaired." (Id.). He concluded that Hill "does show relatively isolated cognitive deficits affecting novel problem solving ability as well as reading comprehension. However, the majority of her cognitive functions are intact." (A.R. 162). Dr. Ewert concluded that because of her impaired functioning with regard to problem-solving and reading comprehension, Hill was disabled from performing the essential functions of her own occupation. In an addendum to the evaluation, Dr. Ewert stated that Hill's cognitive deficits were due to chronic pain and narcotic

---

[5] The Booklet Category test is a sub-test of the Halstead-Reitan Neuropsychological Battery that requires patients to "attempt to abstract the organizing principle or concept involved in seven groups of stimuli presented on sheets of paper in a binder. The number of errors made by the subjects is recorded as a measure of the individual's ability to profit from experience." The Booklet Category Test, http://cps.nova.edu/~cpphelp/BCT.html. Hill made 105 errors on the Booklet Category Test administered by Dr. Ewert. (A.R. 161).

pain medication, "as she does not have mental illness of sufficient severity to cause them, and she does not have structural brain damage." (A.R. 164).

Dr. Ewert's findings were questioned by an independent reviewing physician hired by Hartford, Dr. Annette Swain. Dr. Swain's report characterized Hill's low-average scores on tests of her attention and concentration as "not surprising given her medication regimen, her medications likely do alter her attention and concentration, and thusly can affect other cognitive abilities." (A.R. 139). However, Dr. Swain could find "no clear explanation" of how Hill could score so poorly in reading comprehension, given her education and background. (Id.). Apart from questioning the validity of Hill's score in this category, Dr. Swain noted that a substantial portion of normal patients, when given a battery of neurological tests, score within the impaired range for at least measure of ability. Dr. Swain also consulted with Dr. Ewert, and reported that "[i]f the claimant's job were more routine and not involving job analysis, Dr. Ewert indicated he would have less concern about the claimant's ability to complete her job responsibilities." (Id.). Dr. Swain concluded that Hill did not exhibit sufficient evidence of cognitive limitation beyond a need to take more frequent breaks than a typical employee.

Hill also petitioned Dr. Boortz-Marx to retract his earlier indication that she had no restrictions on her ability to perform fingering and handling functions. In a statement dated May 8, 2009, Dr. Boortz-Marx declared that:

> Based on a review of [Dr. Gaul's] treatment records, as well as my own treatment records, I have concluded that I erred in amending my July 7, 2008, Attending Physician's Statement to state that Ms. Hill has no restrictions in her ability to finger and handle.
>
> In my opinion, Ms. Hill has been *unable* to engage in more than occasional (i.e., zero to one-third of an eight-hour workday) fingering or handling since July 7, 2008.

7

(A.R. 154) (emphasis in original). Dr. Boortz-Marx also added that "I would also suggest that any further questions re: upper extremity function and evaluation be addressed by Dr. Gaul." (Id.). After her most recent carpal tunnel surgery in September 2008, Hill visited Dr. Gaul for follow-up visits on four occasions and participated in a number of occupational therapy sessions. During her final visit with Dr. Gaul on December 3, 2008, Hill reported a 60% improvement in her wrist pain, which had become sharp but intermittent. (A.R. 202). Dr. Gaul recommended that Hill continue therapy, but released her from his care. (A.R. 203). Hill's final documented occupational therapy session occurred on December 10, 2008. (A.R. 206).

This additional information on the condition of Hill's hands and wrists was forwarded to Dr. William Andrews, another of Hartford's independent reviewing physicians. Dr. Andrews reviewed this material and concluded that Hill could not have used her left hand in any repetitive fashion during the recovery period following her surgery, but that as of December 3, 2008, she was "cleared to sedentary capacity work, with use of the left hand." (A.R. 142).

Hartford issued its final determination of Hill's claim on July 27, 2009. Based on evidence of disability in her left wrist, Hartford extended Hill's eligibility for LTD benefits through December 3, 2008. However, after reviewing the reports submitted by Drs. Ewert and Swain, Hartford determined that "neuropsychological testing did not identify any cognitive limits so severe as to preclude employment." (A.R. 128). Finding that she no longer met the Plan's definition of disability after December 3, Hartford upheld its decision denying her LTD benefits after that date. Hill then filed suit for wrongful denial of benefits under 29 U.S.C. § 1132. Each party has filed a motion for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the Record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677, 557 U.S. ___ (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

When reviewing a denial of benefits claim under § 1132(a)(1)(B) of ERISA, a court applies a de novo standard of review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When such discretionary authority is vested in the administrator, the Court's review is limited to whether the administrator abused its discretion. Id. at 111; Bernstein v. Capital Care, 70 F.3d 783, 787 (4th Cir. 1995). Under an abuse of discretion standard, an administrator's decision "will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently." Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997), abrogated on other grounds by Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343 (2008). When determining whether a decision was reasonable, a court may consider the following eight factors:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008) (quoting Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 342-43 (4th Cir. 2000)). The Booth factors are but a more particularized statement of the Court's basic inquiry: whether the decision was "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997) (quoting Bernstein, 70 F.3d at 788). See also Donnell v. Metro. Life Ins. Co., 165 F. App'x 288, 294 n.6 (4th Cir. Feb. 8, 2006) (unpublished).

### A. Conflict of Interest

Hill recognizes Hartford's discretionary authority to determine her eligibility for benefits under the Plan but notes the inherent conflict of interest presented by Hartford's dual role as administrator and insurer of the Plan. See Glenn, 128 S. Ct. at 2349. However, this conflict of interest does not change the standard of review from deferential review to de novo review, or some other hybrid standard. Champion, 550 F.3d at 358. Rather, a district court must take the conflict of interest into account only as "one factor among many" relevant to whether the administrator abused its discretion. Id. (quoting Glenn, 128 S. Ct. at 2351). The Fourth Circuit has recently emphasized that a conflict of interest "should not have a significant role in the analysis" unless other evidence suggests that a plan administrator acted unfairly. Williams v. Metro. Life Ins. Co., 609 F.3d 622, 632 (4th Cir. 2010). Although Hartford's inherent conflict of interest is a relevant factor identified in Booth, the presence of this factor alone does not guide the Court's analysis or modify its deferential standard of review.

### B. Hartford's Decisionmaking Process

Hartford's denial of Hill's claim for LTD benefits was based primarily on its conclusion that she remained capable of sedentary work despite her chronic back problems. To justify its decision, Hartford primarily relied upon its assessment that the weight of the medical evidence in Hill's claim file supported her capability of performing sedentary work, and the results of Hill's vocational analysis, which identified fourteen sedentary occupations for which she was otherwise qualified. Hill argues that Hartford abused its discretion in reaching this conclusion by ignoring substantial evidence that the severity of her disabilities impaired her ability to work in even sedentary occupations.

### 1. Earnings Qualifier

At the outset, the parties dispute whether the Plan's definition of "any occupation" includes a provision requiring that any qualifying alternate occupation pay a salary equal to or greater than 60% of a claimant's pre-disability income. Two documents prepared by Hartford—Hill's Employability Analysis Report and the October 9, 2008, letter denying Hill's claim—characterize such a provision as "required" by the terms of her Plan. (A.R. 237 & 246). The Plan actually defines "any occupation" without an earnings qualifier; any occupation simply means "an occupation for which [an employee is] qualified by education, training, or experience." (A.R. 66). Thus, it appears that Hartford applied a more generous definition of any occupation than the Plan required. Hill argues that because of this, Hartford should now be estopped from defending its decision under the Plan's less restrictive definition.

It is clear, however, that an estoppel theory may not be used to alter the unambiguous terms of an ERISA plan. HealthSouth Rehabilitation Hosp. v. Am. Nat'l Red Cross, 101 F.3d 1005, 1010 (4th Cir. 1996); Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 58 (4th Cir. 1992) (quoting Degan v. Ford Motor Co., 869 F.2d 889, 895 (5th Cir. 1989)) ("Use of estoppel principles to effect a modification of a written employee benefit plan would conflict with 'ERISA's emphatic preference for written agreements.'"). Moreover, Hill cannot claim any resulting prejudice by the fact that Hartford adopted a definition of any occupation that was more favorable to her than the Plan required. Cf. Mitchell v. Metro. Life Ins. Co., 523 F. Supp. 2d 1132, 1145 (C.D. Cal. 2007) (holding that a plan administrator's erroneous application of a less favorable definition of disability was abuse of discretion). Although the Court must evaluate the reasonableness of the decision that Hartford actually made, it will likewise do so against the terms of the Plan as they are actually written.

## 2. Fingering and Handling Capabilities

With respect to Hill's fingering and handling capabilities, Hartford's decision to discontinue LTD benefits after December 3, 2008, was entirely reasonable. Although Hill had been suffering from carpal-tunnel and trigger thumb in both hands since 2006, she received a number of corrective surgeries and procedures, the last of which occurred on September 23, 2008, to release carpal-tunnel in her left wrist. Hill visited Dr. Gaul a total of four times after her surgery for follow-up, and by December 3, 2008, she reported a 60% improvement in the pain she experienced in her left hand. In fact, Dr. Gaul noted that by that point Hill described her pain as "intermittent," and "[h]er chief difficulty now is actually back pain." (A.R. 202). Dr. Gaul prescribed weekly occupational therapy in addition to her pain medication, which the record indicates Hill completed through December 10, 2008, and released her from his care. Although Hartford could no longer reasonably rely on Dr. Boortz-Marx's Attending Physician's Statement in light of his later retraction, see Donovan v. Eaton Corp., Long Term Disability Plan, 462 F.3d 321, 328-29 (4th Cir. 2006), it was well-justified in basing its decision on the office notes submitted by Dr. Gaul, as Dr. Boortz-Marx explicitly suggested. Hartford's independent reviewing physician, Dr. Andrews, reviewed the records submitted by Dr. Gaul and concluded that Hill was physically capable of performing sedentary work after December 3, 2008. This conclusion was consistent with the assessments made by Dr. Gaul; thus, it was reasonable in light of the evidence submitted related to Hill's fingering and handling capabilities.

## 3. Cognitive Impairment and Vocational Analysis

Hill next contends Hartford failed to recognize that her cognitive functioning had become substantially impaired because of the various medications she took to manage her back and wrist pain. Hill, a long-time employee of Novant, was forced to resign after she made repeated errors

13

entering and analyzing physician data between March and July 2006. Throughout the period leading up to her forced resignation, her supervisors noted that Hill was trying, but seemed unable to meet their expectations. Hill asserts that side effects from hydrocodone and tramadol, the narcotic pain medications she was taking, were the underlying reason for her poor job performance and forced resignation from Novant. Hartford apparently agreed when it awarded her LTD benefits, finding her unable to perform the essential functions of her own occupation.

Despite this award of benefits, the burden remained on Hill to establish her inability to perform the essential functions of any occupation when this became the Plan's operative standard of disability on October 9, 2008. To meet this burden, Hill offers the opinion of Dr. Ewert, who concluded that Hill's impaired problem-solving and reading comprehension rendered her unable to perform her prior occupation at Novant as a clinical analyst. However, Dr. Ewert gave no opinion whether these impairments prevented Hill from performing the duties of any occupation. According to Dr. Swain, who reviewed Dr. Ewert's report and discussed its findings with him, if Hill's job were "more routine and not involving job analysis, Dr. Ewert indicated he would have less concern about the claimant's ability to complete her job responsibilities." (A.R. 139). Dr. Swain also questioned the validity of Dr. Ewert's diagnosis, given that Hill scored above average and even "superior" on some of the tests she completed. Hartford reviewed the reports completed by Dr. Ewert and Dr. Swain, concluding that "neuropsychological testing did not identify any cognitive limits so severe as to preclude employment." (A.R. 128). Thus, while upholding its decision to deny benefits, Hartford recognized that Hill continued to suffer, to some extent, from cognitive impairment as a secondary effect of her pain medication. Hartford simply determined, on the basis of both doctors' opinions, that Hill's cognitive impairment was not so severe that it left her unable to work.

However, in denying Hill's claim, Hartford also cited heavily to her Employability Analysis Report as evidence that she was capable of performing at least fourteen other occupations. Some aspects of Hill's EAR suggest that it was not the product of a thoughtful vocational analysis.[6] It was premised on an assumption that Hill's only functional limitation was a relegation to sedentary work; the EAR took no account of her cognitive impairment as noted in 2007 by Dr. Mark and later in 2008 by Drs. Ewert and Swain. Hill's EAR reported the occupational title "Utilization–Review Coordinator" as the closest match to her capabilities and experience, which is not surprising given that it is the same occupational title the DOT assigns to Hill's prior job at Novant as a clinical analyst. Relying on the EAR, Hartford determined that Hill was capable of performing her own occupation, contrary to its prior decision finding Hill disabled according to the own occupation standard. Hartford offered no explanation why its position had changed in this regard.

The fact that Hartford effectively reversed its prior award of benefits is not necessarily an indication of unprincipled reasoning. Hensley v. Internat'l Bus. Machs. Corp., 123 F. App'x 534, 538 (4th Cir. Dec. 13, 2004) (unpublished). A plan administrator may terminate benefits previously awarded if such action is reasonable in light of further investigation and review. Id. However, a contradictory decision that comes "[a] few months later, *and on the basis of no new medical evidence*," is an indication that an administrator's decisionmaking process was unreasonable. Id. at 538 n.3 (quoting Norris v. Citibank Disability Plan, 308 F.3d 880, 885 (8th Cir. 2002)) (emphasis in original). Here, there is no indication that Hartford based its position on some documented improvement in Hill's medical condition between October 2007 and August 2008. She remained on

---

[6] Hartford argues that the Court need not review the merits of Hill's EAR because vocational analysis was unnecessary in light of other, substantial evidence that she was not disabled. Regardless of whether it was necessary, the fact remains that Hartford felt compelled to commission Hill's EAR and explicitly relied on its results when it denied her claim.

15

a steady prescription of narcotic pain medication, and although her prescription for tramadol had been replaced with methadone, nothing in the administrative record suggests Hartford recognized this drug replacement as a basis to conclude that Hill's cognitive functioning had improved. In the absence of this or any other justification, Hartford's finding that Hill was suddenly capable of performing her own occupation was untenable.

At the same time, Hill's vocational analysis cannot be completely discounted as evidence that Hartford sought to engage in a reasoned and principled decisionmaking process. The EAR also matched Hill with several other occupations, including Claim Examiner and Employee Relations Specialist, which were discussed in detail. Hartford's finding that Hill was capable of performing these occupations is not inconsistent with its finding that she was unable to perform her own occupation. The parties devote much of their briefing to comparing medical evidence of Hill's cognitive impairments with the aptitude requirements the DOT assigns to Employee Relations Specialist, which appears to be less onerous than the aptitude requirements of Claim Examiner. The Court is hesitant to delve into the merits of this comparison, which is essentially one of apples to oranges. It does appear, however, that Hartford's conclusion that Hill could perform the essential duties of an Employee Relations Specialist was supported to some degree by the reports subsequently issued by Drs. Ewert and Swain. Both doctors seemed to agree that "more routine" occupations were within Hill's capabilities. Whether the Court would ultimately reach the same conclusion is irrelevant. Ellis, 126 F.3d at 232. The relevant inquiry is whether medical evidence provided an adequate basis for Hartford to conclude that Hill was capable of performing the essential functions of any other occupation for which she was qualified by education, training, or experience, including but not necessarily limited to the occupations discussed at length in her EAR. Although the vocational analysis performed in this case is admittedly flawed in some respects, it

does provide some evidence that Hartford's ultimate decision to deny benefits was a reasonable one.

### 4. Award of Social Security Disability Benefits

Finally, although Hill fails to argue its significance, the Court finds it appropriate to address the fact that Hill's award of Social Security Disability ("SSD") benefits was ignored by Hartford when it decided her claim. The Social Security Administration defines "disability" as:

> [T]he inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. To meet this definition, you must have a severe impairment(s) that makes you unable to do your past relevant work . . . or any other substantial gainful work that exists in the national economy.

20 C.F.R. § 404.1505(a). The Fourth Circuit has held that this definition of disability is not analogous to the Plan's definition of disability under the any occupation standard. See Elliott v. Sara Lee Corp., 190 F.3d 601, 607 (4th Cir. 1999) (finding no significant correlation between a nearly identical plan definition of disability and the Social Security Administration's definition). Thus, the Court recognizes that Hartford was under "'no obligation to weigh the agency's disability determination more favorably than other evidence.'" Gallagher v. Reliance Std. Life Ins. Co., 305 F.3d 264, 275 (4th Cir. 2002) (quoting Elliott, 190 F.3d at 607). However, the Plan required Hill to apply for SSD benefits and offset her monthly LTD benefits award by the amount of SSD benefits she received. (A.R. 63 & 69). Hartford further noted in Hill's claim file that it was not anticipated that her condition would improve to allow her to work in any occupation. (A.R. 108). Yet in its letter denying Hill's claim nine months later, Hartford made no mention of her SSD award or why it had reached a different outcome.

In Glenn, the plan administrator (also operating under an inherent conflict of interest) had encouraged the plaintiff to seek SSD benefits under a theory that she was totally disabled, even

17

referring her to legal counsel for that purpose, but later ignored her award of disability when it denied her claim. 128 S. Ct. at 2352. Additionally, the plan administrator "had emphasized a certain medical report that favored a denial of benefits, had deemphasized certain other reports that suggested a contrary conclusion, and had failed to provide its independent vocational and medical experts with all of the relevant evidence." Id. In light of this additional evidence of procedural unfairness, the Supreme Court held that ignoring the plaintiff's award of SSD benefits "was not only an important factor in its own right (because it suggested procedural unreasonableness), but also would have justified the [district] court in giving more weight to the conflict (because [the plan administrators's] seemingly inconsistent positions were both financially advantageous)." Id.

Here, Hartford's failure to address Hill's SSD benefits award is some evidence of procedural unfairness, as is its rather inexplicable finding as a result of vocational analysis that Hill was not disabled from performing her own occupation. However, other aspects of Hartford's decisionmaking process distinguish it from the facts of Glenn and prevent the Court from placing an overriding emphasis on Hartford's conflict of interest. Hill was given a full opportunity to present information supporting her disability, and it appears that Hartford fully complied with the procedural requirements of ERISA. Each time she appealed a denial of her benefits, Hartford submitted her claim to independent physicians for review. When Dr. Mark recommended that Hartford reverse its decision denying Hill LTD benefits under the own occupation standard, benefits were reinstated. None of the assessments made by Hill's doctors were ignored or misrepresented in Hartford's letters denying her claim for continued disability. And when Dr. Boortz-Marx recanted his earlier statement that Hill was able to perform fingering and handling without restriction, Hartford responded fairly and appropriately by relying on Dr. Gaul's assessments and extending her LTD benefits until December 2008. Against these indications of fairness, the irregularities present do not persuade the

Court that Hartford was "inherently biased" in making its decision. <u>Williams</u>, 609 F.3d at 632.

Although Hill can point to some aspects of Hartford's decisionmaking process that may not have been entirely reasoned and principled, not a single doctor who treated Hill opined that she was unable to perform the essential functions of any occupation as that term is defined by her Plan. In light of this fact, although Hartford's decisionmaking process was not perfect, its ultimate decision to discontinue her benefits cannot be labeled unreasonable.

### III. CONCLUSION

**IT IS, THEREFORE, ORDERED** that the defendant's motion for summary judgment (Doc. No. 14) is **GRANTED**, and the plaintiff's motion for summary judgment (Doc. No. 16) is **DENIED**.

**SO ORDERED**.

Signed: September 26, 2010

Robert J. Conrad, Jr.
Chief United States District Judge